## YOUNG *vs.* KINNEBREW.

[CREDITOR'S BILL TO SUBJECT SEPARATE ESTATE OF MARRIED WOMAN TO PAYMENT OF CHARGE CREATED DURING COVERTURE.]

1. *Construction of deed of gift to trustee, for sole use and benefit of married woman " and heirs of her body."*—A deed of gift, by which slaves are conveyed to a trustee, "for the sole and separate use and benefit, and for the support and maintenance", of a married woman " and the heirs of her body, free from and uncontrolled by her said husband, and to be in no manner subject to or liable for his debts," confers upon her the absolute and equitable interest in the slaves, and gives her children no estate whatever, either jointly with her, or as remainder-men.

APPEAL from the Chancery Court of Macon.
Heard before the Hon. JAMES B. CLARK.

THE bill in this case was filed by Edwin H. Kinnebrew,
on the 14th July, 1857, against Mrs. Dorothea C. Sledge,
her husband, Edmund A. Sledge, and her trustees, Boll-
ing Young and William W. Ross; and sought to subject
to the satisfaction of two promissory notes, executed to
the complainant by Mrs. Sledge, certain slaves held by
her trustees under the deeds hereinafter more particularly
described. One of the notes held by the complainant
was dated the 17th February, 1855, and payable on or
before the 25th December next after date; the other was
dated the 23d February, 1856, and payable on or before
the 25th December next after date; and the bill alleged,
that both of these notes were executed by Mrs. Sledge,
during coverture, for debts contracted by her for the sup-
port and maintenance of herself and children. Of the
slaves sought to be condemned by the bill, some were
conveyed by Bernard Young, the father of Mrs. Sledge,
to Bolling Young as trustee, by deed of gift dated the
18th March, 1841; and the others were conveyed by said
Bolling Young, to William W. Ross as trustee, by deed
of gift dated the 5th April, 1851; of which two deeds the
following are copies:

"State of Alabama, ⎱ Know all men by these presents,
Montgomery county. ⎰ that I, Bernard Young, of the
county and State aforesaid, for and in consideration of the
natural love and affection which I have and bear for
and towards my daughter, Dorothea C. Sledge, wife of
Edmund A. Sledge, of the said county and State, and
also for and in consideration of the sum of one dollar to
me in hand paid by Bolling Young, of the aforesaid county
and State, at and before the sealing and delivery of these
presents, the receipt whereof is hereby acknowledged,—
I, the said Bernard Young, do hereby bargain, sell and
convey unto the said Bolling Young, as trustee for the said
Dorothea C. Sledge and the heirs of her body, the following
described slaves, to-wit", &c., (describing them;) "to have
and to hold the said slaves unto the said Bolling Young,

his executors and administrators, forever; in trust, nevertheless, and for the purposes hereinafter named—that is to say, that the aforesaid slaves, and the future increase of the female part thereof, shall be held by the said Bolling Young, as trustee as aforesaid, for the sole and separate use and benefit, and for the support and maintenance, of the said Dorothea C. Sledge and the heirs of her body, free from and uncontrolled by her said husband, Edmund A. Sledge, and to be in no manner subject to or liable for the debts of the said Edmund A. Sledge, which have been already, or may be hereafter created by him; but shall be enjoyed and held, as a separate estate of the said Dorothea C. Sledge and the heirs of her body, by and through her trustee aforesaid, for her sole use and benefit, and for her separate support and maintenance, and that of the heirs of her body. In testimony whereof," &c.

"State of Alabama, ⎱ Know all men by these presents, Montgomery county. ⎰ that I, Bolling Young, of the county and State aforesaid, for and in consideration of the natural love and affection which I have and bear to and for my sister, Dorothea C. Sledge, wife of Edmund A. Sledge, and also for and in consideration of the sum of one dollar to me in hand paid by William W. Ross, of said county and State, at and before the sealing and delivery of these presents, the receipt whereof is hereby acknowledged,—I, the said Bolling Young, do hereby give, bargain, sell and convey unto the said William W. Ross, as trustee for the said Dorothea C. Sledge and the heirs of her body, the following described slaves", &c. (describing them;) "to have and to hold the said slaves to the said William W. Ross, his executors and administrators, forever; in trust neverthless, and to and for the purposes hereinafter named—that is to say, the said slaves, and the future increase of the female part thereof, shall be held and possessed by the said William W. Ross, as trustee as aforesaid, for the sole and separate use, and for the support and maintenance, of the said Dorothea C. Sledge and the heirs of her body, free from and uncontrolled by her said husband, Edmund A. Sledge, and to be in no manner liable for or subject to any debts which have

been already, or may be hereafter contracted by the said Edmund A. Sledge; but shall be, and are hereby intended to be, a separate and distinct estate of the said Dorothea C. Sledge and the heirs of her body, by and through the trustee aforesaid, for her sole and separate use, benefit and support, and that of the heirs of her body. In testimony whereof," &c.

Bolling Young filed an answer, (which was also adopted by Mrs. Sledge,) in which he admitted the execution of the notes held by the complainant, but denied that their consideration was truly stated in the bill, and averred that Mrs. Sledge was induced to sign them by fraudulent representations on the part of the complainant; admitted the execution of the deeds as alleged, but insisted that Mrs. Sledge did not take such an interest in the property as could be subjected to the satisfaction of the complain- ant's demands; and demurred to the bill—1st, because the children of Mrs. Sledge were not made co-defendants with her; 2d, because the bill did not aver that the profits of the slaves amounted to more than a support and main- tenance for Mrs. Sledge and her children; 3d, because the bill showed on its face that the complainant was not enti- tled to the relief sought by it; and, 4th, for want of equity. The answer was prayed to be taken as a cross- bill for discovery as to the consideration of the notes; and in his answer thereto the complainant reiterated the alle- gations of the bill. A decree *pro confesso* was entered against Edmund A. Sledge, and it appears that William W. Ross was dead when the bill was filed.

On final hearing, on bill, answers, and exhibits, the chancellor overruled the demurrers, and rendered a decree for the complainant; holding that Mrs. Sledge took the absolute interest in the property, and that the notes were a charge on it; and ordering a reference of the matters of account to the master, and a sale of the slaves in the event that the complainant's debt was not paid by a spe- cified day. The overruling of the demurrers, and the final decree rendered, are now assigned as error.

WATTS, JUDGE & JACKSON, for appellants.—1. It is con-

ceded that "heirs of the body", when used without quali-
fying, or explanatory words, import an indefinite failure
of issue, and are words of limitation; but, if there is any
expression in the deed which shows that they were used
by the donor as synonymous with children or grand-
children, that intention will be upheld, and the interest
of the children or grand-children protected.—Fellows,
Wadsworth & Co. v. Tann, 9 Ala. 999; Woodley v. Find-
lay, 9 *ib.* 716; Powell v. Glenn, 21 *ib.* 466; Isbell v. Mac-
lin, 24 *ib.* 320.   The case of Standifer v. Ewing, 18 *ib.* 400,
is not in conflict with this principle, but recognizes it to
the fullest extent:—there was nothing in that case indica-
tive of an intention to use the words in any other than
their technical sense.   The grammatical construction of
the deeds in this case shows, that the donor intended the
slaves for the support and maintenance of Dorothea C.
Sledge (then a married woman with children) and her
children.   The slaves were to be *enjoyed and held* as the
property of her and her children, by and through the
trustee, for the support and maintenance of her and her
children.   The persons meant by "heirs of the body",
were as much the present objects of the donor's bounty,
as the daughter herself: they were to have the same sort
of enjoyment of the property, the same sort of support
and maintenance, by and through the trustee, and at the
same time; and the same terms which give the daughter
an interest, enjoyment, use, support and maintenance, at
the same time, and to the same extent, give an interest,
enjoyment, use, support and maintenance to the persons
designated as "heirs of her body".   The case of Powell
v. Glenn, *supra,* is strikingly like this.—See, also, Shep-
herd v. Nabors, 6 Ala. 631; Dunn v. Bank of Mobile,
2 *ib.* 152.

2. If the children of Mrs. Sledge take jointly with their
mother under the deed, and the property is held for the
joint support and maintenance of them and their mother,
it cannot be subjected to the payment of the mother's
debts, either at law or in equity.—Hill and Wife v. McRae,
27 Ala. 181, and authorities there cited.

3. If the children of Mrs. Sledge do not take jointly

with their mother during her life, they take as purchasers under the deed at her death; in which event, they were necessary parties to the bill.

WM. P. CHILTON, *contra.*—1. As a general rule, a person cannot hold a valuable beneficial interest in property, which cannot be subjected, either at law or in equity, to the payment of his debts.—Rugely & Harrison v. Robinson, 10 Ala. 731. The intervention of a trustee does not protect the property, since equity considers the *cestui que trust* as the real owner, and the trustee as a mere man of straw.—Lamb v. Wragg & Stewart, 8 Porter, 82.

2. The children of Mrs. Sledge take no interest under the deed. "Heirs of the body" are a strictly technical expression, and are primarily regarded as words of limitation, not of purchase.—Lewis on Perpetuities, 348; Ewing v. Standifer, 18 *ib.* 400; Machem v. Machem, 15 *ib.* 373; Lenoir v. Rainey, 15 *ib.* 667; Darden v. Burns, 6 *ib.* 365; Doe v. Appling, 4 Term R. 82; 1 East, 229; Keyes on Chattels, § 250. The deed contains no expression qualifying the technical term. There is no limitation of the use to particular heirs living at any specified time—no period fixed short of an indefinite failure of issue; and the rule against perpetuities is the same in equity as at law. Suppose Mrs. Sledge should die, leaving only great-grand children; would they take as purchasers? Or suppose she should leave one child, ten grand-children, and twenty great grand-children; would they all take as purchasers? and if so, would they take each an equal interest as tenants in common, *per capita,* or *per stirpes?* The fact that the children, though living at the time the deed was executed, are not named in it, is a strong circumstance to show that the word *heirs* was used in its technical sense.

3. There is nothing in the expression, "for her support and maintenance", which can prevent a court of equity from selling the property. Such effect has been allowed to the words, where the property was given to the wife, without other words of exclusion of the husband's rights; and not in cases where the attempt was to subject the

wife's interest.—Rugely & Harrison v. Robinson, *supra*; Spear v. Walkley, 10 Ala. 328; Jasper v. Howard, 12 *ib.* 652. The case of Hill v. McRae, (27 Ala. 181,) relied on by the appellant's counsel, is very unlike the case at bar. There, the trustee was to retain the possession of the property, and apply a portion of the profits to the reasonable support of the beneficiaries; here, the property itself is given.

R. W. WALKER, J.—The estate created by these deeds is a trust estate. But the trust is executed, not executory; and in cases of executed trusts, a court of equity will construe the limitations in the same manner as similar legal limitations.—Marquis of Cholmondely v. Clinton, 2 Jac. & W. 148; Wright v. Pearson, 1 Eden, 119; Jones v. Morgan, 1 Brown's Ch. 206; Lenoir v. Raney, 15 Ala. 667; 1 White & Tudor's Lead. C. Eq. 28. Accordingly, a trust for A. and the heirs of his body will give A. an equitable estate-tail, if the subject be realty; or the absolute title if it be personalty.—Williams' Real Property, 136. For these words, "heirs of his body", have always been held words of limitation, and not of purchase—that is to say, they mark out, or measure the estate of the first taker. Hence, a gift to A. and the heirs of his body is a gift to A. so long as he has such heirs. The heir, if he should take any interest, must take as heir by descent from his ancestor; for he is not constituted by the words of the gift the purchaser or donee of any separate and independent estate for himself.—Williams' Real Pr. 78, 215. *Purchase*, in its legal sense, is "possession to which a man cometh not by title of descent."

It is plain, then, that these deeds vested in Mrs. Sledge the absolute equitable estate, unless there is something in the context which shows that the words "heirs of her body',' as employed by the donors, are words of purchase, and not of limitation. For, though primarily regarded as words of limitation, they may, by the use of other expressions in the instrument, be shown to be words of purchase. Such a departure from the ordinary construction of the words will be made whenever, upon an exam-

ination of the whole instrument, it is plain that the donor intended that the estate of the first taker should cease with his life, and that the property should upon his death vest in the persons who should at *that time* answer the description of heirs of his body.—Williams v. Allen, 17 Geo. 82; Powell v. Glenn, 21 Ala. 459, 467; Jesson v. Wright, 2 Bligh, 1, 53–57; 2 Wms. Ex'rs, 926. As stated by Lord Hardwicke, "the reason why the words 'heirs of the body' create an estate-tail in the first taker, is that they include the issue *in infinitum*."—Hodgson v. Bussey, 2 Atk. 89. Of course, they cease to have that effect, when it is made to appear that they refer, not to the issue *in infinitum*, but only to such issue as shall be living at the death of the first taker.

The feature of the deeds which is relied on as showing that Mrs. Sledge took only a life-estate, and that the words "heirs of her body" were used only as a designation of the persons who at her death should answer that description, is the provision that the slaves shall be held "for the sole and separate use and benefit, and for the support and maintenance of the said Dorothea Sledge and the heirs of her body;" and "to be enjoyed and held as a separate estate of the said Dorothea and the heirs of her body, by and through her trustee, for her sole use and benefit, and for her separate support and maintenance, and that of the heirs of her body." We are unable to perceive anything here which clearly indicates that the estate given by the deed to Mrs. Sledge was to terminate with her life; and that a separate and distinct estate, created by the deed, was to vest in the persons who at her death should fill the description of "heirs of her body." The entire property, the whole equitable estate, is given by the deed; and we know of no principle of construction, which will authorize us to confine the provision for the support and maintenance of the heirs of her body to those only who might be such at her death. These words, construed according to their legitimate import, embrace all the lineal descendants of Mrs. Sledge, through all generations; and there must be strong evidence of an intention to use them simply as *descriptio personarum*, to

justify a court in assigning to them any other than their customary and appropriate meaning.—Jesson v. Wright, 2 Bligh, 1; Hollifield v. Steel, 17 Geo. 285; Supp. to Lewis Perp. 79.

A much more plausible view is, that these words are here used in the sense of *children;* that the gift in the first instance was directly to Mrs. Sledge and her children, and that the children took immediately, as tenants in common with her of the equitable estate. But, in the absence of some more definite indication that such was the sense in which the words were employed, we cannot so far wrest them from the meaning which has for ages been affixed to them, and upon which as a basis a rule of property has been established which is in force wherever the common law prevails. The deed is by no means inartificially drawn, and we cannot apply, in its construction, the liberal rules sometimes adopted in the case of instruments evidently prepared by an ignorant and unskillful hand. Although the intention of the donor must prevail, yet, in ascertaining it, the words which he uses are to be taken in their natural and proper sense; which implies, that technical words are to be construed according to their technical meaning, unless a clear indication is furnished by the context that they were used in a different sense. And if the same words occur in different parts of the same instrument, they must be taken to have been everywhere used in the same sense, unless from the context there appears an intention to the contrary.—Hone v. Vanschaick, 3 Comstock, 538; Thelluson v. Woodford, 4 Vesey, 329; 2 Wms. Ex'rs, 925-6-7.

Considered in the light of these familiar rules, the proper construction of this provision would seem to be, that the support and maintenance which Mrs. Sledge and the "heirs of her body" were to derive from the use of these negroes, were designed to be successive, not simultaneous—that the use to be enjoyed by the heirs of her body was not to begin until hers had terminated; "for", as Lord Coke quaintly says, "the ancestor during his life beareth in his body, in judgment of law, all his heirs; and therefore it is truly said, that *hæres est pars anteces-*

8

*soris.*"—2 Coke's Litt. 146. This is but another form of the maxim, "*nemo est hæres viventis.*" And hence the limitation to the heirs of the body of Mrs. Sledge could not take *in præsenti.*

The cases which seem to afford the most countenance to the construction insisted on by the appellants, are Fellows, Wadsworth & Co. v. Tann, (9 Ala. 999,) and Powell v. Glenn, (21 Ala. 458.) There are three material circumstances which distinguish the first of these cases from this. The estate of the first taker (Mrs. Barnett) was expressed to be " during her natural life." The "support and maintenance", which the heirs were to have out of the property, were to be derived only while it was under the control and management of Mrs. Barnett, and, consequently, terminated with her life. There was an express period provided when the property was to be divided, namely, the death of Mrs. Barnett; thus implying that the words "heirs of the body" referred to the heirs who should then be living.

In Powell v. Glenn, *supra,* the question arose upon the will of Robert Graves. By the 4th and 5th clauses of his will, the testator made separate bequests to his two daughters and to the heirs of their bodies. The 6th clause was in these words—" It is hereby declared more fully to be my intention, that the negroes willed and devised to my two daughters, as above, is for their support and maintenance, and to the support and maintenance of the heirs of their bodies begotten, or to be begotten ; and to descend directly, after their death, to the heirs of their bodies begotten. If either of my daughters above named should die without an heir of their body begotten, then, and in that case, the property so willed to them, or to the one that may so die without an heir, the property of the one so deceased shall pass off, and become the property of my surviving daughter and of my two sons, or their heirs; each one to have a share alike in the property so willed to the one so dying without heirs." The will had been previously before the court in the case of Williams v. Graves, (17 Ala. 62;) and it was then held, that the limtation over in favor of the surviving daughter and the

two sons was valid as an executory devise. That decision was rested mainly on the ground, that where a limitation over, after a dying without issue, is created by the word *survivor* or *survivors*, the courts will construe the words to mean issue living at the death of the first taker; and it is there said, that to support a limitation over, when applied to personalty, the courts will lay hold of slight circumstances or expressions to relieve themselves from the construction of an indefinite failure of issue. 17 Ala. p. 65; see, also, 18 Ala. 132.

We apprehend, no such rule prevails where there is no limitation over, and where the sole question is whether an apparently absolute estate is, by other expressions, cut down to one for life. In Powell v. Glenn, *supra*, the previous decision in Williams v. Graves was approved and adhered to. It is true that, in the opinion delivered by Chief-Justice Dargan, much stress was laid upon the provision, that the slaves given to the daughters should be for their support and maintenance, and for the support and maintenance of the heirs of their bodies begotten, or to be begotten. But the argument derived from this provision was employed merely as cumulative of the grounds on which the previous decision had been placed. The principle which was held to govern the case, and under the influence of which the court departed from the technical meaning of the words, was, that "heirs of the body" will be construed as words of purchase, and not of limitation, whenever it is apparent from the whole instrument that the estate of the first taker is restricted to an estate for life, and that the property, as a separate and distinct estate, is to vest in the children of the first taker who may be living at his death.—p. 467.

Now, there were several features of the will in that case, which served to indicate an intention to confine the estate of the first taker to one for life. In the first place, there was the limitation over to the *survivors*, in the event of the death of either daughter without heirs; as to the force of which, see Williams v. Graves, *supra*. Again, it is clearly indicated, (and in this respect the provision is materially different from that found in the present deed,)

that the direction for "the support and maintenance" of the heirs had reference only to a period co-extensive with the life-time of the first taker; for it is expressly provided, that the property itself (not the mere right to support and maintenance out of it) is "to descend directly, after their death, to the heirs of their bodies;" terms which, of themselves, show that the testator supposed that the estate of the first taker would terminate with her life.—McVay v. Ijams, 27 Ala. 238, 244. As the support and maintenance provided for the heirs were to terminate with the life of the first taker, this was, as Chief-Justice Dargan argued, a circumstance strongly indicating that the testator supposed that the children of his daughters would derive a benefit from the use of the slaves even before the death of their mother. These different provisions, when taken together, showed plainly that the testator intended that the estate of the daughter should cease with her life, and that the property should then vest in her children, or, in default of children at the time of her death, in the surviving sister and two brothers. But neither of these features, upon the united effect of which the court passed in that case, is to be found in the deed before us. There is here no limitation over in the event of the death of Mrs. Sledge without heirs. The donor does not seem to have anticipated such a contingency as the failure or termination of the estate given to his daughter and the heirs of her body. There is no provision that the property itself is to descend directly after the death of the first taker to the heirs of her body. There is no provision or expression limiting the support and maintenance which the heirs were to derive from the use of the property to the life-time of the first taker, and, therefore, no *necessary* implication that they were to take a benefit from such use before the death of Mrs. Sledge. We think, that neither of the cases referred to is an authority in support of the construction insisted on by the appellants; and that, under these deeds, Mrs. Sledge took the absolute equitable estate in the property.—Ewing v. Standifer, 18 Ala. 400; 15 *ib.* 373; 5 *ib.* 578; 26 *ib.* 593; 22 *ib.* 433.

Decree affirmed.